GREEN, INC., APPELLANT, *v.* SMITH ET AL., APPELLEE.

[Cite as Green, Inc., v. Smith (1974), 40 Ohio App. 2d 30.]

(No. 308—Decided March 6, 1974.)

*Mr. John G. Poulos,* for appellant.
*Mr. Robert Huffer* and *Mr. John Adams,* for appellee.

GRAY, J. The complaint filed in this cause prays that defendants be required to convey the property described therein to plaintiff. In addition thereto, damages are demanded in the amount of $20,000. In the alternative, if specific performance is not granted, a judgment allowing $250,000 damages is requested. The cause was tried to the court without the intervention of a jury and the issues were found in favor of defendants.

Plaintiff filed its notice of appeal and alleged the following errors:

"1. The trial court erred in ruling that the purported survey presented by defendants which lacked the surveyor's signature and registration number was a valid survey as contemplated by the parties and required by the agreement.

"2. The trial court erred in ruling that the plaintiff corporation failed to perform its part of the agreement as to the $2,500.00 additional deposit.

"3. The trial court erred in ruling that time was of the essence to the completion of the agreement and the extension thereof."

We find none of them well taken. We will address ourselves to them in the above order.

R. C. 4733.14 states, in pertinent part, as follows:

*"Plans, specifications, plats, and reports issued by a registrant shall be stamped with the said seal when filed with public authorities,* during the life of the registrant's certificate, but no person shall stamp or seal any documents with said seal after the certificate of the registrant named thereon has expired or has been revoked, unless said certificate has been renewed or reissued." (Emphasis added.)

In the construction of the above words, we are compelled to come to the conclusion that since the plat was not to be filed with any public authority a stamped seal is not

necessary to its validity. Neither is the surveyor's signature or registration number. However, the typed name of the engineering firm does appear on the plat. *Expressio unius est exclusio alterius* means the mention of one thing implies the exclusion of another.

Furthermore, from the record it appears that plaintiff never made a complaint to defendants concerning the alleged defect until this action was brought. When plaintiff claimed this defect existed and was part of its case, it had the burden of proving such contention by the requisite degree of proof. This it did not do.

If plaintiff were properly concerned about this alleged defect, it could have had the survey checked by another surveyor. It could have checked the rolls of registered surveyors and engineers to varify that the surveyors were registered. It could also have called members of Dumond-Sifford and Associates, whose typed name appears on the plat, to learn first hand their qualifications.

We desire to make the further comment that it often occurs that no distinction is drawn between the license itself and the certificate of license. There is a difference. The term "license" refers to the right or privilege conferred, and the certificate of license is merely the written document which evidences such right. *Again, where the license is granted by a board's official action, of which there is an official record, the certificate is only evidence of the license and not the license itself.*

The following testimony was elicited from Mr. Hennis, president of the corporate plaintiff:

"Q. Did you ever object to that survey?

"A. Yes, I believe so, but I don't remember when.

"Q. You are not too sure. Who did you object to, do you know?

"A. I do not.

"Q. Or when you objected?

"A. No, I do not."

It is interesting to note that plaintiff has neither claimed nor shown that the survey, plaintiff's exhibit 2, is inaccurate, that it does not correctly represent the facts por-

trayed thereon, or that plaintiff was misled in any way. Its sole contention is that it is not a valid survey because a surveyor's signature and registration number were not placed thereon. Plaintiff has not cited us to any authority to support this contention. No prejudice to plaintiff has been shown. The appellate courts of Ohio only consider prejudicial error on review.

We will treat assignments of error Nos. 2 and 3 together as they are inextricably entwined. To properly resolve these questions, it is necessary to allude briefly to the facts.

On May 4, 1971, defendants, as sellers, made an offer to plaintiff to sell certain real estate described in the offer. The offer was accepted by plaintiff.

The pertinent parts of the contract are as follows:

"The undersigned Sellers hereby propose to sell the real estate generally described as follows, to-wit: [description of property] at a consideration price of Sixty-Five Thousand Dollars (65,000.00), on the following terms:

"Five Hundred Dollars (500.00) deposit upon acceptance of this contract by the Buyer; Two Thousand Five Hundred Dollars, ($2,500.00) deposit at such time as the contingencies concerning zoning have been met; and the balance in full in cash at the time of closing. The sale is to be closed on or before August 6th, 1971, unless such time is extended by mutual agreement of the parties in writing.

"The premises shall be conveyed by general warranty deed, free and clear of all liens, easement, restrictions and encumbrances, excepting taxes which shall be pro-rated to date of closing, and title shall be good and marketable and such as will be insured by a reputable title insurance company, satisfactory to Buyer, at usual rates. Sellers to furnish a survey, at Sellers' expense."

The contingent event concerning the change of zoning did not occur before the date fixed for the conclusion of the transaction. The time for performance by the parties was extended by the following clause:

"In consideration of the Buyers forfeiting the $500.00 deposit and in the further consideration of the Buyers increasing the final purchase price by the sum of $1,000.00

to a total of $66,000.00, said Sellers hereby grant the Buyers an extension of six months on this contract and further agree that said contract will be extended beyond six months to complete the rezoning, provided that the Circleville Zoning Commission has formally approved the application for said rezoning."

The rezoning matter was concluded on December 31, 1971, when the ordinance was signed by the mayor. It had already been passed by council on December 21, 1971. By virtue of the provisions of R. C. 731.29, it became effective 30 days *after it was filed with the mayor.* The six months extension of time provided by the contract expired February 6, 1972.

The following question then arises: why wasn't the $2,500 payment made? The testimony of Mr. Hennis is particularly illuminating. He claimed that after the rezoning had been accomplished, there were three flaws in the proceedings on the part of defendants. They were: (1) title insurance had not been obtained by defendants; (2) a copy of the deed had not been submitted by defendants to plaintiff; (3) a proper survey had not been furnished.

Upon further examination as a witness, Mr. Hennis testified that it was the obligation of plaintiff to take care of the title insurance. We have already treated at length the effect of the absence of a surveyor's signature, seal and registration number. Plaintiff was required to secure title insurance if it wanted it. It could be easily ascertained by plaintiff whether the title was good, in the name of the defendants. No claim is made by plaintiff that defendants refused to deliver a deed to it when plaintiff had performed its agreement.

Defendants claim and it is borne out by the record that the deposit of $2,500 was not made. It also appears that the tender of the purchase price of $65,000 was never made.

The testimony of Mr. Hennis throws considerable light upon the matter of the payment of the $2,500 required by the agreement.

Mr. Hennis testified as follows:

"Q. How was this $2,500 deposit made after March the 6th, 1972, in what form?

"A. After March the 6th, 1972—I had on March the 6th—Mr. Simon, I had been able to get in touch with him over the previous weekend and I had a check made out to Robert Huffer, Smith Estate, for $2,500 with my signature on it and then when I met with Mr. Simon like on Sunday afternoon prior to the 6th he said that I made the check out wrong, it was to be escrowed to the Shamrock Realty Company, therefore when the deposit was made on March the 6th or thereafter Mr. Simon made those arrangements with them for the deposit in escrow.

"Q. You don't know how he did it?

"A. No.

"Q. Did you sign the check to Shamrock Realty?

"A. Not for that deposit, for the $2,500 on the second check, the first check I had signed, Green Inc. on it and the second check Mr. Simon had written a personal check which only required one signature.

"Q. So Green Inc. did not make the $2,500 deposit when it was made, right?

"A. That is correct.

"Q. Now, I believe your testimony was that you had an oral commitment from the Investors Companies in January?

"A. That is correct.

"Q. Now before January 1972 what funds did Green Inc. have available for the purchase of this property?

"A. We had other corporations that we would have loaned out of, corporations into Green Inc. to close the transaction.

"Q. And had any loans been made to Green Inc.?

"A. None to this date.

"Q. So that up until this oral commitment you had no funds in Green Inc. for the purpose of purchasing this property?

"A. That is correct.

"Q. You anticipated financing it through Investors Companies?

"A. I did not anticipate it. As I previously stated there were funds in other corporations to close the real estate transaction, but by using leverage and so forth we were

able to obtain an oral investment commitment from Investors Companies Inc.

"Q. Did Green Inc. have in hand $2,500 additional to make the additional deposit?

"By Mr. Poulos: I object. As long as the deposit was made it doesn't make any difference from whom, from the principle or its companies.

"By the Court: Well, it may have some bearing as far as the contract is concerned. I don't know. Objection overruled.

"A. Would you repeat the question?

"Q. Did Green Inc. have in hand $2,500 additional to make the additional deposit?

"A. I cannot answer that because I am not the bookkeeper.

"Q. You are the President but you don't know how much money Green Inc. had?

"A. No.

"Q. You don't have any idea?

"A. No.

"Q. Is it possible then that Green Inc. had no cash available as far as you know?

"A. No, that is not possible because we'd written previous checks of which they were in receipt of one for $500, which you know about.

"Q. That was in December from Shamrock Realty?

"A. The check was drawn on Green Inc. sir.

"Q. In other words, the $500 forfeited check came from Green Inc.?

"A. That is correct."

The above testimony of Mr. Hennis, president of plaintiff, does not indicate readiness, willingness, ability or eagerness to perform Green's obligations for the payment of money required to be paid. In fact it shows great aversion to opening its pocketbook. The fact that the president of plaintiff did not know whether there was enough in the bank account of plaintiff to cover the $2,500 payment to defendants then due coupled with the stalling tactics of plaintiff's officials in regard to producing the money no doubt

caused apprehension on the part of defendants as to wheth-ther or not they were dealing with persons who were able financially to perform their agreement.

The fact that plaintiff was trying to peddle part of the property to Standard Oil Company, and did not succeed, further indicates that at least at that time the officials of Green did not have a clear idea of how they were going to develop the real estate. It further indicates that as officials of the company and as individuals they did not want to commit their funds, but were waiting for someone else to come forward with the necessary money.

Green Inc. did not produce evidence that it had the money with which to make the $2,500 payment until March 3, 1972, at least.

Having established these facts, let us proceed now to apply the law to them.

Assuming, *arguendo,* the correctness of plaintiff's contention that time is not of the essence in this real estate transaction, we come to this rule of law: even if time was not of the essence in a contract for the sale of realty, as originally made, it may be made so by the subsequent conduct of the parties.

Where a purchaser defaulted on a contract for the sale of realty and the vendors acquiesced, but notified the purchaser, that there could be no further delay and insisted that the closing date set forth in the contract be adhered to, and such position was understood and agreed to by the purchaser, the parties by their conduct made time of the essence. *Shullo Construction Co.* v. *Miller,* 2 Ohio App. 2d 177.

The time for performance here was extended six months by mutual agreement to give time to accomplish the rezoning of the property. This object was accomplished within the appointed time. We think that the language in *Isom* v. *Johnson,* 205 Ala. 157, 159, 87 So. 543, 544, 545, is enlighting:

"The new agreement averred, extending the time in which complainant might pay, must be accepted as evidence that payment within the month of December was considered

to be essential. *Chabot* v. *Winter Park Co.*, 34 Fla. 258, 15 South. 756, 43 Am. St. Rep. 192; *Foster* v. *Ley*, 32 Neb. 404, 49 N. W. 450, 15 L. R. A. 737; *King* v. *Ruckman*, 20 N. J. Eq. 316; 4 Pom. Eq. Jur. Sec. 1408, note bottom of page 3344. But complainant neither performed, nor tendered performance, within the time limited by the new agreement, though he did 'arrange for the money' and tell defendant he was ready. It may be conceded that in the ordinary case the complainant's offer to perform may be made in his bill; but an expression of readiness or willingness to perform, one or both, such as the bill here avers, is not the equivalent of an actual offer to perform. *Sou. Cot. Oil Co.* v. *Darling*, 85 South. 544; *Cowan* v. *Harper*, 2 Stow. & P. (Ala.) 236; 38 Cyc. 142. And in this case it was incumbent upon the vendee, complainant, to make an actual tender of the agreed purchase price during the month of December, since, as we have seen on the authorities, payment within that month had by the new agreement been made essential. This was the very meaning of the new contract. 4 Pom. Eq. Jur. Sec. 1407, note on page 3341; 29 Am. & Eng. Encyc. 692; *Hart* v. *McClellan*, 41 Ala. 251; *Mitchell* v. *Wright*, 155 Ala. 458, 46 South. 473.''

We have the added and important feature in the present case that plaintiff agreed to a forfeiture of $500 for an extension of time along with an agreement to pay an additional $1,000 for the property. This certainly shows that time, if it were not before, was now considered as being of the essence by both the defendants and the plaintiff. Plaintiff *bought* more time. Cf. *Reade* v. *McKenna*, 99 N. J. Eq. 764, 134 A. 371; *Blocker* v. *Lowry* (Ala.), 233 So. 2d 233; 4 Pomeroy's Equity Jurisprudence (5th Ed.), page 1055.

In this case, the stipulations of the contract are mutual and dependent—that is, where the deed is to be delivered upon the payment of the purchase price, an actual tender and demand by one party is necessary to put the other in default, and to cut off the right of the latter to treat the contract as subsisting. Tender serves two purposes: It puts the defendants in default, and, as an offer to

do equity, it gives the plaintiff standing to invoke equitable relief. Plaintiff's case fails in these respects.

A decree for the specific performance of a contract is not a matter of right, but of grace, granted on equitable principles and rests in the court's sound discretion. *Sanford* v. *Breidenbach*, 111 Ohio App. 474. In the light of the above facts we cannot say that the trial court abused its discretion. The text writers say that a plaintiff, in order to prevail in an action for specific performance, must show that he was *ready, willing, able and eager* to perform his obligations. The facts show that this plaintiff was not ready, willing and able to perform on or before February 6, 1972. It certainly was not eager. Under the circumstances of this case, we hold that time was of the essence after February 6, 1972.

If we follow the line of reasoning of plaintiff, the defendants upon signing the agreement would be required to permit plaintiff to adopt the position of "heads I win, tails you loss." The plaintiff could drag the matter out long after the date was set by the extension for the complete performance of the contract. It could demand specific performance and if that were not granted, it could, in the alternative, demand damages which it did do here. It is apparent that plaintiff waited until financing came from sources other than its own, then it decided to move. This was 30 days after its rights under the agreement had been terminated. It is an old axiom of equity that he who seeks equity must do equity. Plaintiff has not satisfied this standard.

We find no prejudicial error among those assigned and argued, therefore, the judgment of the trial court is affirmed.

*Judgment affirmed.*

STEPHENSON, P. J., and ABELE, J., concur.