886 F.2d 330
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
GREENWOOD TRADING CORPORATION, Plaintiff-Appellee,
v.
Robert B. WESTENDARP, Trustee, and National Land Development
Company, Defendants/Third-Party Plaintiffs-Appellants,
v.
GREENWOOD LAND DEVELOPMENT, INC., Greenwood Parkway, Inc.,
First National Bank of Ohio, and David W.
Swetland, Defendants-Appellees.
 No. 88-3855.
 United States Court of Appeals, Sixth Circuit.
 Sept. 28, 1989.
 
 Before RALPH B. GUY, Jr., BOGGS and ALAN E. NORRIS, Circuit Judges.
 RALPH B. GUY, Jr., Circuit Judge.
 
 
 1
 This appeal challenges the district court's judgment terminating a contract for the sale of realty by plaintiff Greenwood Trading Corporation (Greenwood) to defendants Robert Westendarp and National Land Corporation (hereinafter jointly referred to as Westendarp or National Land) and awarding Greenwood liquidated damages. National Land seeks reversal of the district court's judgment and either specific performance of the contract or damages. We decline to grant the requested relief and affirm the district court's judgment for Greenwood.
 
 
 2
 Greenwood is an Ohio corporation that buys and develops land. National Land is a Texas corporation that buys land for resale or for development through joint ventures with other developers. Robert Westendarp, as the trustee for and part owner of National Land, negotiates land purchases and sales on behalf of National Land. On December 30, 1987, Greenwood and Westendarp executed an "Agreement of Sale and Purchase of Unimproved Property" (the Agreement). The Agreement was printed on a form provided by Westendarp and stated that Westendarp would purchase from Greenwood eighteen acres of land in Sagamore Hills, Ohio, for $868,000. Westendarp intended to form a joint venture to develop a 261-unit apartment complex on the land. The Agreement indicated that time was of the essence and set a closing date on the later of May 31, 1988, or thirty days following Greenwood's compliance with certain specified conditions relative to the sale, or within thirty days after objections to title have been cured. The Agreement also provided that National Land would notify Greenwood twenty days prior to closing that all conditions had been satisfied and that it was ready to close. In accordance with the Agreement, National Land deposited a total of $25,000 in earnest money into an escrow account. Three thousand dollars of the earnest money was deposited on January 6, 1988. The balance was deposited on February 16, 1988.
 
 
 3
 Around May 10, 1988, Westendarp apparently approached Greenwood officials indicating that he would be unable to close on May 31, and seeking to extend the closing beyond that date. He reportedly explained that he was encountering some difficulties in obtaining a final financing commitment from mortgage lenders because of concerns about the reconstruction of a highway bridge leading to a portion of the property.[1] Greenwood responded by pointing to the Agreement's provision authorizing up to two thirty-day extensions for $10,000 each. Westendarp did not avail himself of such an extension and did not, at that time, express any dissatisfaction with Greenwood's compliance with the Agreement's conditions.
 
 
 4
 On May 12, 1988, having received no notice from Westendarp that the conditions were satisfied and that Westendarp was prepared to close, Greenwood's attorney sent Westendarp a letter stating that Greenwood had met the required conditions, that National Land's failure to provide the required notice presumably reflected that Westendarp was not prepared and did not intend to close on May 31, 1988, and that National Land's default on the Agreement would result in its forfeiture of its earnest money and any rights to the property. Greenwood's May 12 letter was followed by another letter dated May 26, 1988, that reiterated the substance of the May 12 letter and notified Westendarp that Greenwood was depositing in escrow a warranty deed conveying the property to Westendarp. At that time, however, Greenwood only held title to six of the eighteen acres although it had an option to purchase the remaining twelve acres.
 
 
 5
 On May 27, 1988, National Land, by letter, informed Greenwood that several of the Agreement's conditions had not been met. When National Land failed to tender to the escrow agent the balance of the purchase price necessary to consummate the deal on May 31, 1988, Greenwood, pursuant to the Agreement, elected to terminate the Agreement and to receive and retain the $25,000 in earnest money.[2] National Land protested that the Agreement was not terminated. Rather, it claimed that Greenwood had failed to fully satisfy the conditions of the Agreement.
 
 
 6
 Greenwood subsequently brought an action in federal district court seeking a declaration that the Agreement terminated as of June 1, 1988, and that it was entitled to the earnest money. Greenwood also sought to enjoin National Land from interfering with Greenwood's further attempts to sell the property. In a counter-claim and third-party complaint, National Land claimed that the Agreement's closing date automatically extends to thirty days beyond the date on which the Agreement's conditions ultimately become satisfied. National Land also sought to enjoin Greenwood from interfering with its own plans to resell the property. National Land's actions were partially motivated by the fact that on May 17, 1988, it entered into a letter of intent Agreement to resell the property to M. Myers Properties, Inc. (Myers), for $1,389,000.[3] (App. 113).
 
 
 7
 The district court consolidated the preliminary injunction hearing with a trial on the merits. The court concluded that the Agreement was terminated, that Greenwood was entitled to the $25,000 in earnest money as liquidated damages, and that National Land's preliminary injunction motion was moot. The court further determined that National Land lacked standing to claim any further contractual rights under the Agreement or to otherwise interfere with Greenwood's rights relative to the property.
 
 
 8
 On appeal, National Land reiterates its claim that Greenwood failed to satisfy the Agreement's conditions. It also claims that, as a matter of law, Greenwood was not entitled to terminate the Agreement because, when Greenwood placed in escrow the warranty deed conveying the property to National Land, it only held title to six of the eighteen acres. Therefore, National Land claims that because Greenwood was not itself ready, willing, and able to perform, it was not entitled, under Ohio law, to rescind the Agreement.
 
 I.
 
 9
 We will not disturb the district court's findings of fact unless they are clearly erroneous. Taylor & Gaskin, Inc. v. Chris-Craft Indus., 732 F.2d 1273 (6th Cir.1984). The court's legal determinations, however, are reviewable de novo.
 
 
 10
 The district court found that National Land's professed dissatisfaction with Greenwood's compliance with the Agreement's conditions was merely a ruse to acquire more time to enable Westendarp to consummate the resale of the property to Myers.
 
 
 11
 We conclude that the district court's characterization of the events and circumstances giving rise to this dispute is not clearly erroneous and is supported by several considerations. For one, the Agreement indicates that time is of the essence and specifies a targeted closing date of May 31. That both parties understood May 31 as the target date is underscored by Westendarp's request for an extension at the May 10 meeting between the parties. Moreover, as detailed below, several of the Agreement's provisions required Greenwood to fulfill conditions within thirty days of the effective date of the Agreement. Nevertheless, National Land did not object to Greenwood's performance until months after some of that performance was actually due, and after indicating its satisfaction with performance of some of the very conditions it now challenges as unsatisfied. These facts militate against Westendarp's claim that the Agreement authorized him to extend the contract ad infinitum by expressing dissatisfaction. Although the district court concluded that Westendarp's last-minute assertion of dissatisfaction was a sham, it also found that Greenwood fulfilled the expressed conditions in a manner satisfactory to Westendarp. Accordingly, the court did not regard Greenwood's deviations from strict compliance with the Agreement's conditions as a pivotal issue in this case.
 
 
 12
 More specifically, the conditions that National Land identified in its May 27 letter as unsatisfied are set forth in paragraphs 1, 4, 6, and 8 of an addendum to the Agreement. Those paragraphs provide:
 
 1. UTILITIES:
 
 13
 The Property shall have available to it, at its boundary lines, utilities, including electrical and gas service and sanitary sewer and water sufficient to service 261 apartment units with washer and dryer connections. Seller shall obtain for the benefit of Buyer at least thirty (30) days before the Closing Date, utility availability letters ("Utility Letters") in the standard form, addressed to Buyer, from each applicable governmental, municipal or private utility company or authority, each stating that the respective utility service is available to satisfy the conditions contained in this Section. The Utility Letter for sanitary sewer service and water shall state that such utilities and services shall be available, constructed and operational to the boundary line or through existing easements, of the Property upon the payment of only the standard tap fees and the amount of such fees. Buyer shall not be required to pay any sums in addition to standard tap and connection fees for any of the aforesaid services or utilities.
 
 4. ZONING:
 
 14
 The Property shall be zoned and Final Development Plan approved to permit the construction and operation of 261 apartment units in buildings of no more than three (3) floors each, and related facilities by the City and County in which the Property is located and any other governmental authority having jurisdiction over the Property. Seller shall deliver to Buyer within thirty (30) days prior to Closing proof satisfactory to Buyer that the Property is so zoned and the Final Development Plan so approved.
 
 6. DRAINAGE:
 
 15
 The Property shall have adequate drainage to drain the Property after it is developed as intended by Buyer without the requirement of any action by any government authority or the construction of any offsite detention pond, storm sewer or other drainage facilities. Seller shall furnish Buyer proof satisfactory to Buyer of adequate drainage within thirty (30) days after the effective date of this contract.
 
 8. ENVIRONMENTAL STANDARDS:
 
 16
 The development of the Property as intended by Buyer shall meet all environmental standards and requirements of any municipal, county, state and federal authority having jurisdiction over the Property. Within thirty (30) days of the effective date of this contract, Seller shall furnish Buyer with all the necessary approvals from all applicable authorities, satisfactory to Buyer, reflecting that upon the development of the Property as intended by Buyer the Property shall comply with all environmental standards and requirements.
 
 
 17
 With regard to the zoning condition, the district court noted that Bill Thomas, an elected trustee of Sagamore Hills Township, testified "that the Township is the only governmental entity with jurisdiction to approve a plan such as that submitted by Greenwood." (App. 65-66). The court also noted that Thomas had absolutely no personal interest in the transaction and that Greenwood notified Westendarp by an April 8, 1988, letter that no additional approvals were necessary. Westendarp protested to the district court that the term "Final Development Plan" employed in paragraph four of the addendum encompassed more than the site plan approved by the Sagamore Hills Zoning Commission; it encompassed a more detailed, complete plan subject to approval by various other authorities. Accepting Westendarp's interpretation of the term, however, the court noted that Westendarp's failure to submit such a plan to Greenwood precluded Greenwood from submitting such a plan for approval. Moreover, we note that paragraph seventeen of the Agreement authorized National Land to terminate the Agreement and to receive its earnest money upon notice to Greenwood by February 15, 1988, that zoning or other ordinances and laws were incompatible with National Land's intended use of the property. National Land gave no such notice to Greenwood.
 
 
 18
 With respect to the drainage facilities condition specified in paragraph six of the addendum, Westendarp challenges as inadequate Robert Jackson's[4] January 29, 1988, letter indicating that an existing thirty-six inch storm sewer would provide the requisite drainage. Jackson indicated that he could not guarantee the adequacy of the drainage facilities, however, without detailed calculations that only could be provided by Westendarp's engineers. Notably, paragraph six expressly requires proof of adequate drainage to be provided within thirty days of the effective date of the Agreement, which was executed on December 30, 1987. If the drainage was inadequate, then Greenwood technically was in breach thirty days thereafter. Yet, Westendarp did not object to the adequacy of the drainage assurance until May 27, 1988, when he complained that the assurance should have been from a third party, rather than from Jackson.
 
 
 19
 Westendarp also challenges as inadequate Greenwood's environmental assurances relative to the property. Greenwood procured a letter from the Ohio Environmental Protection Agency certifying that the property was not on the agency's most recently compiled list of hazardous waste sites. Westendarp claims that paragraph eight of the addendum required further environmental assurances from all governmental authorities having jurisdiction over the property. Testimony at trial indicated that the paragraph pertaining to environmental standards was the source of some confusion and prompted Greenwood officials to contact Westendarp for clarification. According to Jackson, Westendarp explained that, in other states, environmental issues necessitating further clearances arise relative to the types of buildings planned. Because Ohio is not such a state, the parties reportedly agreed that a hazardous waste site clearance would be sufficient. Westendarp raised no objections to the clearance obtained until his May 27 letter, notwithstanding the fact that the Agreement required the environmental clearances to be in place within thirty days of the Agreement's effective date.
 
 
 20
 Finally, as to the condition governing utilities, paragraph one of the addendum requires that the property shall have utilities available to it sufficient to service 261 apartment units and that Greenwood shall obtain utility availability letters thirty days prior to closing. The paragraph also contains language requiring that the utility availability letters demonstrate that "the respective utility service is available to satisfy the conditions contained in this Section." Westendarp claims that this language requires all utilities to be available at the time of closing rather than at some future point when the development project was ready to become operational. Greenwood first obtained a letter indicating that the utilities shall be available. After receipt of National Land's May 27 letter, Greenwood obtained from the engineer who supplied the first letter clarification that the utilities are available. The court found that the clarification letter comported with the requirements of paragraph one of the addendum.
 
 
 21
 Although Westendarp also claimed to have expressed dissatisfaction with Greenwood's performance of the conditions at their May 10 meeting, the district court credited Greenwood's officials' contrary accounts of the substance of that meeting. The district court also found that Greenwood's perception that it had satisfied the conditions in question was reinforced by a series of Westendarp's handwritten notes that were telefaxed to Greenwood's president, Robert Vitt, on February 15, 1988. (App. 98-99). The notes indicate that "all utilities appear to be available" and that "drainage proof" was received from Greenwood and "appears OK." The notes also acknowledge Ohio's EPA's letter indicating that "no known hazardous waste" was on the property and that the "site plan" is due on March 1. Westendarp characterizes these notes as merely reflecting his preliminary determination that Greenwood was capable of satisfying the conditions, such that deposit of the $22,000 balance in earnest money the next day, as prescribed by the Agreement, was not contraindicated. We note, however, that these notes, considered along with Westendarp's failure to object to Greenwood's compliance with the conditions until four days prior to the targeted closing date, do not support Westendarp's claim that Greenwood performed unsatisfactorily. Westendarp was not required to telefax any "preliminary" notes to Greenwood. The fact that he did, coupled with their content, persuades us that they were intended to convey Westendarp's satisfaction with Greenwood's performance of certain specified conditions. The pretextual nature of Westendarp's claims is underscored by the fact that the very conditions he protests are unfulfilled have no bearing on his plans for the property. Westendarp abandoned his apartment development plans and intended to sell the property to Myers. Myers has its own development plans and conditions relative to its purchase of the property.
 
 
 22
 We decline to disturb the district court's determination that National Land's professed dissatisfaction with Greenwood's performance was disingenuous and not supported by the record. Rather, there is ample evidence to support the district court's finding that Westendarp was satisfied with Greenwood's performance.
 
 II.
 
 23
 We next consider Westendarp's claim that Greenwood was not entitled to terminate the contract because of the undisputed fact that, at the time of closing, Greenwood did not hold legal title to all of the subject property.[5] Because this issue was first raised during final argument before the district court, it is questionable whether the issue is properly before us.[6] Nevertheless, even if the issue was properly before us, we would find Westendarp's claim untenable for several reasons.
 
 
 24
 The record reflects that National Land was well aware of the status of Greenwood's title at the time of contract, yet never objected to it. Paragraph fourteen of the Agreement requires any objections to Greenwood's title to be submitted to Greenwood and the title company within thirty days after receiving a title commitment for insurance.[7] No such objections were raised. Moreover, paragraph nine of the Agreement establishes the closing date as the later of May 31, 1988, thirty days after the conditions are met, or thirty days after objections to title have been cured. Again, no objections to title were raised until trial.
 
 
 25
 Both parties agree that although Greenwood was not required to hold title to the entire eighteen acres at the time of contract, it did have to assure conveyance of good title to the full acreage at the time of closing. Schottenstein v. DeVoe, 83 Ohio App. 193, 198, 82 N.E.2d 552, 554 (1948). In this case, however, Greenwood's ability to convey marketable title to National Land at the time of closing never was tested because, both prior to and on the date of closing, it became apparent that Westendarp would not perform. This default, pursuant to the Agreement, authorized Greenwood to terminate the Agreement and to receive and retain the earnest money. Had National Land objected in a timely fashion to the status of Greenwood's title, Greenwood conceivably could have exercised its option to acquire title to the remaining acreage in time for, rather than after, closing. Because no objection was raised, Greenwood's only obligation with respect to title was to acquire and convey good title at the time of performance. This obligation was excused, however, when it became apparent that National Land's performance would not be forthcoming. See Will-O-Way Development Co. v. Mills, 34 Ohio App. 525, 529, 171 N.E. 360, 361-62 (1929), aff'd, 122 Ohio St. 242, 171 N.E. 94 (1930), in which a buyer's default excused the vendor's obligation to tender legal title because the refusal to go forward was prompted by the buyer and entitled the vendor to elect to rescind the contract. See also Ritchie v. Cordray, 10 Ohio App.3d 213, 216, 461 N.E.2d 325, 329 (1983), in which the court stated that "[i]t is well-settled that tender of performance by one party to a contract is excused where it is clear to that party that the other party is unable to perform" and that "defendants were under no obligation to convey title to a buyer who, even though pressed to close the sale, had given no indication that he could or would pay for the property." In this case, contrary to his position on appeal, Westendarp indicated that he was encountering difficulty obtaining financial commitments and sought to extend the closing date. This was why National Land never gave Greenwood the requisite twenty-day notice that it was prepared to close, which would have triggered Greenwood's obligation to set in motion whatever steps were necessary to enable it to convey good title at closing.
 
 
 26
 Paragraph fourteen of the Agreement provides National Land with two options in the event of a title defect; it could terminate the Agreement and take back the earnest money, or waive unsatisfied conditions and complete the purchase. National Land did neither of these things. Had it tendered the balance of the purchase price at closing, its interest in the property once Greenwood acquired full title would have been protected by the doctrine of estoppel by deed. Under that doctrine, which is recognized by Ohio, a grantor of real estate who conveys property by warranty deed while having either no title or defective title to the property and who subsequently acquires title to that property is estopped from preventing the after-acquired title from inuring to the benefit of the grantee. Gatts v. E.G.T.G., GMBH, 14 Ohio App.3d 243, 470 N.E.2d 425 (1983).
 
 
 27
 In this case, we conclude that National Land's belated protestations about Greenwood's ability to convey marketable title at closing are not legitimate because, had National Land given Greenwood notice that it was prepared to close, Greenwood could have taken steps to obtain full title by the time of closing. Alternatively, had National Land tendered the purchase price, it would have acquired title, by virtue of estoppel by deed, at such time, after May 31, that Greenwood acquired title to all of the property. Having done neither of these things, nor having previously objected to title or terminated the Agreement on the basis of title defects, and having itself defaulted on the Agreement, National Land now cannot compel specific performance of the Agreement or the award of damages. See Green, Inc. v. Smith, 40 Ohio App.2d 30, 317 N.E.2d 227 (1974), in which a buyer who sued for specific performance did not prevail because he failed to demonstrate that he was "ready, willing, able and eager to perform his obligations." Id. at 38-39, 317 N.E.2d at 233. See also Kirby v. Harrison, 2 Ohio St. 326 (1853) (vendee's failure to tender payment when due constituted default and precluded specific performance).
 
 
 28
 The district court's judgment is AFFIRMED.
 
 
 
 [1]
 At trial, Westendarp admitted that he had not applied for a loan to finance acquisition of the property. (App. 322). He explained that no loan application was necessary until thirty days after the conditions were met
 
 
 [2]
 Paragraph fifteen of the Agreement provides, in pertinent part, that "[i]f buyer fails to close this sale and is in default hereunder, Seller, as its sole remedy, may terminate this contract and receive the Earnest/Option money and the Additional Earnest Money as liquidated damages."
 
 
 [3]
 Ultimately, Greenwood sold the property to Myers
 
 
 [4]
 Robert Jackson was the vice-president of Greenwood at the time
 
 
 [5]
 Greenwood did obtain title to the remaining twelve acres prior to the time the district court rendered its decision
 
 
 [6]
 No mention of this issue appears in Westendarp's letters to Greenwood protesting Greenwood's unilateral termination of the Agreement or in Westendarp's district court pleadings. Westendarp's allegations were limited to Greenwood's failure to comply with conditions in the Agreement unrelated to title
 
 
 [7]
 In the notes that Westendarp telefaxed to Greenwood is a notation regarding the title commitment that states: "Title Commitment--Received 1/18--Comments due by 2/18. NEED: (1) Letter representing that Seller has parcels not owned by Seller under long-term purchase contact & will be able to deliver title as stipulated by our contract." (App. 98). National Land does not contend that this notation constitutes an objection to title. We find that the notation reflects Westendarp's understanding and acceptance of the status of Greenwood's title provided that marketable title would be conveyed at closing