[Cite as *Coldwell v. Moore*, 2017-Ohio-526.]

STATE OF OHIO, COLUMBIANA COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| DAVID COLDWELL, ET AL., | ) | |
| | ) | |
| PLAINTIFFS-APPELLANTS, | ) | |
| | ) | CASE NO. 15 CO 0024 |
| V. | ) | |
| | ) | OPINION |
| MATTHEW MOORE, ET AL., | ) | |
| | ) | |
| DEFENDANTS-APPELLEES. | ) | |

CHARACTER OF PROCEEDINGS:      Civil Appeal from Court of Common Pleas of Columbiana County, Ohio Case No. 2011 CV 131

JUDGMENT:      Reversed and Remanded

APPEARANCES:

For Plaintiffs-Appellants      Attorney Alan D. Wenger
Attorney Matthew M. Ries
26 Market Street, Suite 1200
P.O. Box 6077
Youngstown, Ohio 44501-1111

For Defendants-Appellees      Attorney Robert J. Karl
41 South High Street
Suites 2800-3200
Columbus, Ohio 43215

JUDGES:

Hon. Gene Donofrio
Hon. Cheryl L. Waite
Hon. Mary DeGenaro

Dated: February 14, 2017

DONOFRIO, J.

**{¶1}** Plaintiffs-appellants, David and Lisa Coldwell, appeal the judgment of the Columbiana County Common Pleas Court entered against them on their complaint seeking specific performance or damages for breach of contract against Defendants-appellees, Matthew and Lorelei Moore, Michael and Colleen Lester, Blaine and Mary Moore, and Lynette Moore Beeler.

**{¶2}** This case was previously before this court in *Coldwell v. Moore,* 7th Dist. No. 13 CO 0027, 2014-Ohio-5323 ("*Coldwell I")*. In *Coldwell I*, we set forth the facts:

> Plaintiffs-appellants David Coldwell, et al., appeal the decision of the Columbiana County Common Pleas Court rescinding a purchase agreement between themselves and defendants-appellees Matthew Moore, et al., for the sale of mineral rights.

> Although this dispute resulted in a bench trial, the facts are generally undisputed on appeal. Plaintiffs-appellants David Coldwell and Lisa Coldwell (collectively, the Coldwells) own and operate a sustainable tree farm that sits atop approximately 600 acres in Salineville, Columbiana County, Ohio. The tree farm is comprised of twelve surface parcels which they own, but they do not own approximately 200 acres of the subsurface parcels.

> Defendants-appellees Matthew and Lorelei Moore, Michael and Colleen Lester, Blaine and Mary Moore, and Lynette Moore Beeler (collectively, the Moores) each own an undivided one-quarter interest in four subsurface parcels that total approximately 237.41 acres. Three of their subsurface parcels underlie the Coldwell's tree farm and the other underlies a surface parcel contiguous to the Coldwell's tree farm but owned by Marvin and Juanita Hiltabidle (collectively, the Hiltabidles) who are not parties to this case. The Moores, who reside in Harrogate, Tennessee and collectively have owned the parcels since 2007, had purchased some of the subsurface parcels and the others were

received as gifts from previous generations of the Moore family, including David O'Mahen, an uncle by marriage to the Moores.

In 2007, David Coldwell learned about the Forest Legacy Program (FLP). The FLP is a grant program administered by the U.S. Forest Service. The FLP gives landowners money in exchange for restricting the use and development of their land, particularly the surface of the land. When David Coldwell looked into the FLP, a person with the Division of Forestry indicated to him that participation in the FLP was contingent upon the landowner owning *all* of the mineral rights to the property.

The Coldwells also learned that while the FLP restricted exploitation of the surface minerals, such as surface strip mining for coal, it did not foreclose subsurface mineral exploitation with a limited surface impact. In other words, the FLP did not forbid oil and gas exploration.

As it pertained to the Coldwell's surface parcels that were located above the Moore's subsurface parcels, David Coldwell believed that his surface parcels contained the rights to oil and gas while the Moore's subsurface parcels contained only rights to coal and other mineable minerals. Sometime in 2007 or before, David Coldwell contacted the Moore's predecessor in title, David O'Mahen, about purchasing the four subsurface parcels. After consulting with family members, O'Mahen offered to sell the parcels to him for $50,000, but he declined.

After 2007, defendant-appellee Matthew Moore replaced O'Mahen as the Moore's representative and David Coldwell contacted him several times through 2008 and 2009 about buying the Moore's subsurface parcels. Coldwell told Moore that he thought that the Moore's subsurface parcels were of little value, but that he wanted to

buy them to improve his chances with the FLP.

Meanwhile, still believing that they owned the oil and gas rights to all of their property, the Coldwells signed an oil and gas lease with Patriot Energy Partners (Patriot) in 2008. The lease included the Coldwell's surface parcels that were located above three of the Moore's subsurface parcels.

In 2010 and after David Coldwell had fallen ill, his son Jed Coldwell renewed his family's efforts to buy the Moore's parcels. Matthew Moore and Jed reached an agreement which Moore understood to mean that they would reserve royalty interests on all minerals, not just coal.

The Coldwell's attorney prepared a Purchase Agreement under which the Moores conveyed to the Coldwells "MINERAL RIGHTS ONLY" in the four subsurface parcels for $8,000 with the Moores retaining royalties on coal. The Coldwells signed the agreement and sent it to the Moores along with a $100 earnest money check. The Moores cashed the check, signed the agreement and sent it back to the Coldwells.

The Coldwells' attorney then prepared a deed and sent it to the Moores. This time, after examining the deed, Matthew Moore noticed the coal royalties reservation. He called David Coldwell and told him mistakes had been made but that they would sign the deed if the mistakes were fixed. David Coldwell conveyed his willingness to pay the balance of the purchase price, demanded the Moores sign the deed, but they refused.

On February 14, 2011, the Coldwells sued the Moores in Columbiana County Common Pleas Court seeking specific performance of the purchase agreement, or in the alternative, damages resulting for the alleged breach of that agreement. The Moores

answered, denying the breach and, in the alternative, contesting the validity of the agreement. They included with their answer counterclaims and cross-claims. The counterclaim alleged that they were fraudulently induced into entering into the Purchase Agreement. Concerning the lease the Coldwells had signed with Patriot which was later assigned to Chesapeake, the Moores sought a declaration that they were the sole owners of all of the mineral rights. Although the Moores also included a third-party complaint against Patriot and Chesapeake, the Moores later dismissed their claims against them without prejudice prior to trial.

On May 21, 2012, the Moores filed a motion for partial summary judgment on their counterclaim for declaratory relief. Specifically, the Moores sought a declaration that their mineral rights to the four subsurface parcels included oil and gas in addition to their undisputed rights to the coal. The trial court denied the motion, then, upon the Moores' motion to reconsider, granted the motion. In a January 2, 2013 judgment entry, the trial court declared that the Moores' mineral rights included oil and gas.

A bench trial was conducted on February 19–20, 2013, to decide the remaining issues. On May 20, 2013, the trial court filed a judgment entry entering judgment for the Moores, finding that the Coldwells had failed to prove the existence of an enforceable contract. Because the court found that there was no enforceable contract, it did not make any findings "regarding the other issues presented, including whether time was of the essence under the Purchase Agreement or whether the Moores were fraudulently induced to enter into the Purchase Agreement."

*Id. at* ¶ 1-14.

**{¶3}** In *Coldwell I,* this court reversed the grant of summary judgment that

rescinded the Purchase Agreement on the basis of mutual mistake. Id. at ¶ 45. We affirmed the trial court's judgment declaring that the Moores' mineral rights included oil and gas. *Id.* We remanded the case to the trial court to address what it identified in its May 20, 2013 decision as "other issues presented, including whether time was of the essence under the Purchase Agreement or whether the Moores were fraudulently induced to enter into the Purchase Agreement." *Id.*

{¶4} The trial court has now entered judgment finding that time was of the essence and, therefore, there was no enforceable contract. The trial court entered judgment against Coldwells on their complaint for specific performance or damages for breach of contract. The Coldwells filed a timely appeal. The trial court also concluded that the Moores were not fraudulently induced to sign the Purchase Agreement and entered judgment against the Moores with regard to this issue. The Moores have not filed an appeal.

{¶5} The Coldwells' first assignment of error states:

THE TRIAL COURT ERRED IN FINDING THAT TIME WAS OF THE ESSENCE.

{¶6} The trial court concluded that time was of the essence, first, because the express language in the purchase agreement made time of the essence and, second, because the parties' actions and the circumstances surrounding their negotiations compelled the conclusion that time was of the essence.

{¶7} Generally, in contractual relationships, the time of performance is not of the essence. *Brown v. Brown,* 90 Ohio App.3d 781, 784, 630 N.E.2d 763 (11th Dist. 1993); *Shelton v. Twin Twp.,* 12th Dist. No. CA2014-07-004, 2015-Ohio-1602, ¶ 40. The parties to a contract, however, may make time of the essence either expressly or implicitly. According to the *Shelton* court, "Ohio courts are split as to whether and when 'time is of the essence' may be implied in a contract." *Shelton* at ¶ 40. The *Shelton* court explained that some courts have found that "time is of the essence" may be implied "whenever a definite date is fixed for compliance." *Id.,* citing *Lake*

*Ridge Academy v. Carney,* 9th Dist. No. 91CA005063, 1991 WL 215024, *4 (Oct. 16, 1991) and *Calabrese v. Vukelic,* 7th Dist. No. 94-L-37, 1995 WL 750140, *1 (Dec. 14, 1995), citing *Domigan v. Domigan,* 46 Ohio App. 542,546, 189 N.E.2d 860 (5th Dist. 1933). *Shelton* explains that other courts hold that the general rule may be altered implicitly depending on the nature of the contract or the circumstances under which it was negotiated. *Shelton* at ¶ 40, citing *Green, Inc. v. Smith,* 40 Ohio App.2d 30, 37-38, 317 N.E.2d 227 (4th Dist.1974) and *Franklin Mgt. Indus., Inc. v. Far More Properties, Inc.,* 8th Dist., 2014-Ohio-5437, 25 N.E.2d 416, ¶ 16. Lastly, according to *Shelton,* there are courts that combine these approaches and consider the nature and circumstances of the negotiation, and the fixed date. *Shelton* at ¶ 40, citing *Marion v. Hoffman,* 3d Dist. No. 9-10-23, 2010-Ohio-4821, ¶ 23 and *Nippon Life Ins. Co. of Am. V. One Source Mgt., Ltd.,* 6th Dist. No. L-10-1247, 2011-Ohio-2175, ¶ 24.

**{¶8}** We first address the issue of whether the Purchase Agreement made time of the essence by including a fixed date for closing. In this regard, the parties contest the importance of the language in the Purchase Agreement which provides that "Closing shall take place on or before November 7, 2010." The trial court, citing this court's decision in *Vukelic,* concluded that the express language of the Purchase Agreement made time of the essence. The trial court concluded that *Vukelic* "is consistent with the general rule that when the provisions of a contract are clear and unambiguous, a court must enforce it as written." The trial court also relied upon the decision in *Tiefenthaler v. Tiefenthaler,* 5th Dist. No. 02 CA 29, 2002-Ohio-6438, a case involving a contract for the purchase of real estate that included a statement that closing was to occur within 30 days. Referring to what it called the "rule of *Vukelic"* and the "rule of *Tiefenthaler*", the trial court concluded that because the transaction was not completed by the date set for the closing, the Purchase Agreement became unenforceable*.*

**{¶9}** *Vukelic* did not involve a contract for the sale of real estate and was not concerned with the issue of a closing date. Rather, it involved the settlement of civil litigation in which the defendant orally agreed to pay the plaintiff $5,000.00 within 30

days. When payment was not made, plaintiff asked that the settlement agreement be set aside. The trial court denied the motion, indicating that time was not of the essence to the settlement agreement. This court, citing *Domigan,* reversed the trial court and held that time was of the essence and failure to pay the settlement monies within the 30 days rendered the settlement agreement unenforceable.

{¶10} *Domigan*, in fact, states that "time is considered as the essence of all contracts." *Domigan* at 547. The *Domigan* court, however, also explained that "courts of equity are as much bound to see that contracts are executed as courts of law." *Id.* The *Domigan* court explained that its decision was based on the facts of that particular case. *Id.* at 546. *Domigan* was initially instituted by Fannie Domigan against Horace Domigan. Fannie secured a judgment against Horace, on a cognovit note, for $3,969.75. Judgment was entered on October 28, 1932. The judgment was set aside in January 1933, and Horace's motion for leave to file an answer instanter was granted. The trial court then held that Horace was entitled to specific performance of a contract for the sale of real estate from Horace to Fannie. The *Domigan* court discussed the agreement for the sale of real estate from Horace to Fannie. The agreement was dated February 8, 1932.   Per the agreement, Horace was to provide to Fannie a general warranty deed free and clear of all encumbrances except for a mortgage held by Fidelity Building Association and Loan Company of Delaware. For consideration, Fannie was to surrender to Horace a mortgage and note held by Fannie against Horace for $2,797.52. The agreement provided that the deal be closed on or before the first of March 1932. The deal was never closed and in October 1932, Fannie obtained judgment on the cognovit note. The judgment was set aside and the trial court ordered specific performance of the contract.

{¶11} In reversing the trial court, the *Domigan* court noted that absent from the record was a marketable title or deed which Horace was to have provided by the first of March 1932. *Id.* at 546-547*.* The court explained that, even assuming Horace's testimony that he tendered such a deed on February 2, 1933 is true, this should not entitle him to specific performance of the contract when the closing was to occur on

or before the first of March 1932, almost one year prior, and Fannie had now sued on the cognovit note and secured a judgment. It is under these circumstances that the *Domigan* court concluded that, although a court of equity should seek to enforce contracts in the same manner as a court of law, time was of the essence. *Id.* at 547.

**{¶12}** The trial court also indicated that it relied upon the "rule of *Tiefenthaler*" to arrive at its conclusion that the language of the agreement in the case *sub judice* made time of the essence. Before addressing *Tiefenthaler,* we consider *Wardell v. Turkovich,* 5th Dist. No. 91AP070037, 1992 WL 195480 (July 31, 1992), which is discussed in *Tiefenthaler.*

**{¶13}** *Wardell,* like *Domigan,* involved an agreement for the sale of real estate that included a closing date. The trial court in *Wardell* concluded that since a closing date was specified in the contract, time was of the essence and, after that date, there was no legally enforceable agreement. The court of appeals reversed holding that while time may be of the essence, it does not mean that performance at the *specified* time is necessarily of the essence. In *Wardell*, the Turkovichs entered into an agreement to sell real estate to Resort Management on June 18, 1990. The purchase agreement set forth a closing date of October 31, 1990. On November 3, 1990, the parties agreed to an addendum extending the closing date to November 15, 1990, at which time the purchase would be completed or Resort Management would remit an additional $10,000.00 in earnest money with the remaining portion of the purchase price to be paid within a reasonable time as determined by the parties. Before November 15, 1990, Resort Management made the payment. On December 4, 1990, the Turkovichs entered into an agreement to sell the same parcel of land to Wardell. The trial court held that, since the agreement with Resort Management contained a closing date, time was of the essence, and since the agreement was not closed on the date specified, Resort Management's contract could not be enforced.

**{¶14}** On appeal, the Fifth District concluded that where there is a specified closing date in an agreement to purchase real estate, the failure to perform on the specified date does not *per se* terminate the seller's duty to convey and failure to

convey does not *per se* discharge the buyer. *Wardell* at *2. The court of appeals held that a specified date for payment or conveyance does not make time of the essence, or at least not the *specified* time. *Id.* Reversing the trial court, the Fifth District ordered specific performance of the agreement with Resort Management. *Wardell*, then, held that, while time is of the essence, inclusion of a specified closing date in a purchase agreement for real estate does not make performance at the specified time of the essence. *Id.*

**{¶15}** We now turn to what the trial court here called "the *Tiefenthaler* rule*."* *Tiefenthaler* involved a purchase agreement for real property which included language requiring closing within 30 days of execution. The purchase agreement was entered in June 2000. The first closing date was scheduled for August 25, 2000. It was then rescheduled for September 25, 2000. Neither party thereafter actively pursued another closing appointment. In August 2001, appellants learned the property was listed for sale by a realtor. On October 24, 2001, appellants sought specific performance. A magistrate granted a motion to dismiss concluding that appellants had failed to perform their end of the contract, thereby excusing appellees' performance.

**{¶16}** On appeal, the appellants relied upon *Wardell,* arguing that time was not of the essence and that the dismissal of their case for failure to perform was error. The court, however, in affirming the trial court's decision, did not affirm by simply stating that time was of the essence. In fact, the *Tiefenthaler* court explained that it was unpersuaded that the trial court denied appellants their requested relief based upon a "per se" violation of the 30 day closing provision. *Tiefenthaler* at ¶ 17. The court explained that after the closing date passed, appellants took no action to secure the closing for nearly an entire year, despite the fact that the parties were all blood relatives and all of them resided in Ohio. *Id.* This decision, in our opinion, is not inconsistent with *Wardell.*

**{¶17}** *Lake Ridge Academy,* also cited by *Shelton,* did not involve a purchase agreement for the sale of real estate. Rather, it involved an Enrollment Contract for

the payment of charges for tuition, books, and supplies for a full academic year. The Enrollment Contract provided that if it was not cancelled in writing by August 1, the full amount for tuition, books, and supplies was due. Defendants cancelled via a letter postmarked August 7 and received by the Academy on August 14. The Academy sued seeking full payment. The trial court rendered judgment for defendant finding that defendant substantially complied with the contract and thus there was no breach. The court of appeals reversed. After first concluding that payment under these circumstances was not a "penalty" because the Academy determined its budget based upon enrollment, the court of appeals, without much further explanation, held that, although time is generally not of the essence in a contract, the parties may make it so by express stipulation. *Lake Ridge Academy* at *4. Since the Enrollment Contract provided a definite date for compliance, the court concluded that time was of the essence. *Id.* (The Ohio Supreme Court subsequently affirmed but, in doing so, concluded that the issue in *Lake Ridge Academy* was not whether time was of the essence since the Academy was not arguing that its obligation to educate the student was discharged or changed by the defendant's conduct. *Lake Ridge Academy v. Carney,* 66 Ohio St.3d 376, 378-379, 613 N.E.2d 183 (1993), ("*Lake Ridge II*").

**{¶18}** Finally, *Shelton* involved a barn that presented a safety hazard. Twin Township sought to persuade the Sheltons to repair or demolish the barn. The Township passed a resolution requiring the demolition of the barn. The Township had the legal right to demolish the barn 30 days after providing notice. The parties entered an agreement allowing the Sheltons 90 days to remove the dilapidated portion of the barn and repair the salvageable portion. On the 91st day, the Township commissioned a contractor to demolish the barn. The Sheltons, after various other proceedings, obtained a judgment from the trial court for wrongful demolition and breach of contract. After concluding that Ohio courts were divided on the issue of whether time is of the essence where a date for performance is provided, the *Shelton* court used what it called a combined approach, i.e., it considered the nature and circumstances of the negotiation *and* the fixed date. *Shelton* at ¶ 40-41, 45-46. The

*Shelton* court held:

> Accordingly, we find that the combination of the nature and circumstances of the negotiation and the fixed date provided in the contract establish that time for performance was of the essence. Thus, the Sheltons materially breached the contract when they failed to repair or demolish the barn within 90 days of March 12, 2011.

*Shelton* at ¶ 46.

**{¶19}** The above cases do not suggest an iron-clad rule that, where an agreement to purchase real estate includes a closing date, the purchase agreement becomes unenforceable if the deal is not closed on the specified closing date. Here the Coldwells indicated a willingness to consummate the agreement and the Moores indicated a willingness to continue if changes were made to the deed about mineral rights.   And this court held in *Coldwell I,* the inclusion of a closing date by itself did not mean that time was of the essence so as to render the Agreement void after that date. Under these facts, based solely on the inclusion of a closing date, time was not of the essence.

**{¶20}** The trial court also concluded that the parties' actions and the circumstances surrounding their negotiations also compelled the conclusion that time was of the essence. The trial court referred to two things to support its conclusion that the actions of the parties and the circumstances surrounding their negotiations demonstrate that the specified closing date was of the essence: that the closing date was linked to the Forest Legacy Program (FLP) and that the Coldwells "imposed a closing date that fit their schedule" because a later date near Thanksgiving would be too late for the FLP and because the Coldwells had an economic incentive to close the transaction.

**{¶21}** In determining whether these facts support the legal conclusion that the specified closing date was of the essence, we must remember what the words "time is of the essence" means:

when it is said that time is of the essence, the proper meaning of the phrase is that performance by one party at the time specified in the contract or within the period specified in the contract is essential *in order to enable him to require performance from the other party.*

*Lake Ridge II* at 378, citing 6 Williston on Contracts (3 Ed.1962) 181, Section 846. Also see *SRW Environmental Servs., Inc. v. Dudley,* 12th Dist. No. CA2008-11-282, 2009-Ohio-3681, ¶ 14, and *Franklin Mgt. Industries, Inc. v. Far More Properties, Inc.,* 8th Dist. No. 101397, 2014-Ohio-5437, ¶ 18.

**{¶22}** The transaction in this case ended only when the Moores refused to sign the deed unless the changes regarding the sale of mineral rights other than coal royalties were made. This court concluded in *Coldwell I* that those demands were unjustified as there was, in fact, a meeting of the minds. Thus, the only thing keeping this transaction from being consummated, at most eleven days after the date set for closing, was the Moores' demand that the deed be changed contrary to what they agreed to sell in the Purchase Agreement.

**{¶23}** The Moores argue that time was made of the essence by the Coldwells. The Moores point to the findings of fact that the closing date was linked to the pending FLP application; that Matthew Moore testified the Coldwells were in a hurry because the FLP grant was coming up again; that Coldwell testified that the FLP application was moving very quickly toward completion and submission; that the FLP was likely to make a decision in December 2010; that the Coldwells were in a hurry to close the transaction; that Matthew Moore testified that Thanksgiving would be too late; that the Coldwells believed they had a better chance if they owned all of the mineral rights for the property; that the likely reason the Coldwells tree farm was not selected based on applications before 2010 was that the Coldwells did not own all of the minerals; that David Coldwell testified that that they would like the warranty deed returned so they could say they owned the coal and mineral rights; and that the Coldwells had an economic incentive to close the transaction.

**{¶24}** The trial court concluded that the actions of the parties and the

circumstances surrounding their negotiations made time of the essence. The facts must be read in light of the fact that the initial communications between the parties about this purchase and sale began sometime in 2007, or before, between David Coldwell and the Moores' predecessor in title, David O'Mahen. *Coldwell I,* ¶ 6. Communications continued through 2008 and 2009. *Id.* at ¶ 7. The Purchase Agreement was signed in 2010. *Id.* at ¶ 10. The Moores cashed the earnest money check upon signing the Agreement. *Id.* Upon receiving the deed the Moores demanded that changes be made and indicated they would proceed if the changes were made. *Id.* at ¶ 11. The Coldwells conveyed their willingness to pay the balance of the purchase price but refused to change that part of the deed relating to mineral rights. The result was *Coldwell I.* Thus, after the closing date both parties expressed their willingness to consummate the Agreement. *Coldwell I* resolved the issue about the mineral rights in the agreement. The Moores' argument that both parties behaved as if time was of the essence for the November 7, 2010 date is not supported by the facts.

**{¶25}** The facts do not support the assertion that either of the parties viewed the passage of the closing date as an event that prohibited either from being able to require performance by the other. If the deed had been signed on November 18, 2010, and then delivered to the Coldwells, the injury would have been little or nothing. The trial court's conclusion that time was of the essence, either because a specific closing date was included in the Purchase Agreement or because of the actions of the parties and the circumstances surrounding their negotiations, was in error.

**{¶26}** Accordingly, the Coldwells' first assignment of error has merit and is sustained.

**{¶27}** The Coldwells' second assignment of error states:

THE TRIAL COURT ERRED IN RULING THAT THE COLDWELLS HAD TO TENDER PERFORMANCE BEFORE THE MOORES TENDERED A DEED SO THAT THE TRANSACTION COULD BE

CONSUMMATED.

**{¶28}** As a part of its discussion about whether or not time was of the essence, the trial court found that the Coldwells' performance was essential in order to enable the Coldwells to require performance by the Moores. The trial court concluded that since the Coldwells did not at least tender performance on or before the closing date, they could not complain that the Moores refused to sign the deed. The trial court relied upon *Lake Ridge II* as authority for this proposition. The trial court does not separate this issue in its judgment entry as a singular reason as to why there was an unenforceable contract, but includes it as part of its explanation as to why it concluded that time was of the essence.

**{¶29}** The Coldwells argue that after they delivered the deed to the Moores, and the Moores refused to sign, their tender of performance at that point would have been futile. (There is a chronological gap between the signing of the Purchase Agreement and the Moores' cashing the $100.00 earnest money check, and the Moores receipt of the deed. In the interim, the closing date passed).

**{¶30}** In support of their position, the Coldwells refer to *Spalla v. Fransen,* 188 Ohio App.3d 658, 2010-Ohio-3460, 936, N.E.2d 552 (11th Dist.). *Spalla* concerned a purchase agreement that was modified a half dozen times. Shortly before the closing, the sellers were notified that the buyers were not in possession of a correct deed (the name of the purchaser was changed after a deed had been prepared and signed by the sellers with the original name) and that the check for earnest money could not be cashed due to insufficient funds. *Id.* at ¶ 21. On appeal, the argument that the sellers did not timely deliver the deed was not found to be persuasive. The appellate court explained that the tender of performance was not required when the other party cannot or will not perform. *Id.* at ¶ 23, citing *Ritchie v. Cordray*, 10 Ohio App.3d 213, 216, 461 N.E.2d 325 (10th Dist. 1983).

**{¶31}** The issue presented in this assignment of error is whether or not some event had to occur before there was an enforceable Purchase Agreement. "A condition precedent is a condition which must be performed before the obligations in

the contract become effective." *Hiatt v. Giles,* 2d Dist. No. 1662, 2005-Ohio-6536, ¶ 23, quoting *Rudd v. Online Resources, Inc.,* 2d Dist. No. 17500, 1999 WL 397351, *7 (June 18, 1999), quoting *Troha v. Troha,* 105 Ohio App.3d 327, 334, 663 N.E.2d 1319 (2d Dist.1999). If a condition precedent is not fulfilled, a party is excused from performing the duty promised under the contract. *Id.* The question of whether the provision in a contract is a condition precedent or merely a promise is a question of the parties' intent. *Id.* "Intent may be ascertained by considering the language of a particular provision, the language of an entire agreement, or the subject matter of an agreement." *Id.* Conditions precedent are not favored by the law. *Id.* Whenever possible, courts "avoid construing provisions to be such unless the intent of the agreement is plainly to the contrary." *Id.*

**{¶32}** The Purchase Agreement does not suggest any conditions precedent. The items in the Purchase Agreement identified by the Moores do not suggest that they are conditions precedent. Instead, the things the Moores assert were conditions precedent were promises made as a part of this bilateral contract. There is a dearth of evidence that the parties agreed that any event in their bilateral contract for the purchase/sale of the mineral rights involved had to be performed before there would be an enforceable contract. There are no facts which would lead to the conclusion that there was a condition precedent in this agreement or that there was some obligation on the part of the Coldwells to tender performance of some type before the Moores were required to sign the deed.

**{¶33}** Accordingly, the Coldwells' second assignment of error has merit and is sustained.

**{¶34}** The Coldwells' third assignment of error states:

THE TRIAL COURT ERRED IN REQUIRING THE COLDWELLS TO PROVIDE ADDITIONAL CONSIDERATION TO THE MOORES TO EXTEND THE CLOSING DATE WHEN THE MOORES WERE RESPONSIBLE FOR THE CLOSING NOT OCCURRING BY THE DATE IN THE PURCHASE AGREEMENT AND THEN

SUBSEQUENTLY DEMANDING THAT THE COLDWELLS CHANGE THE TERMS OF THE PURCHASE AGREEMENT BEFORE THEY COULD SIGN THE DEED.

**{¶35}** The Coldwells argue that, if time was of the essence, then the Moores waived the requirement that the closing take place on the specified date. In light of our conclusion that time was not of the essence in this bilateral contract, the Coldwells' third assignment of error is moot.

**{¶36}** The Coldwells' complaint sought specific performance of the Purchase Agreement or damages for breach of contract. Since the trial court concluded that there was no enforceable contract, it made no decision regarding the appropriate remedy.

**{¶37}** For the reasons stated above, the trial court's judgment is reversed and this matter is remanded to the trial court for purposes of determining the appropriate remedy, i.e., specific performance or damages.

Waite, J., concurs.

DeGenaro, J. concurs.